# EXHIBIT 21

```
 1              UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   ------------------------------x

 4   U.S. BANK NATIONAL ASSOCIATION,:

 5   as Trustee for the Registered  :

 6   Holders of Wachovia Bank       :

 7   Commercial Mortgage Trust,     :

 8   Commercial Mortgage Pass-      :

 9   Through Certificates, Series   :

10   2006-C28, acting by and through:

11   its Special Servicer, CW       :

12   CAPITAL ASSET MANAGEMENT, LLC, :

13        Plaintiff,                :

14        -vs-                      : Case No.

15   DEXIA REAL ESTATE CAPITAL      : 12-cv-09412-SAS

16   MARKETS f/k/a ARTESIA          :

17   MORTGAGE CAPITAL CORPORATION,  :

18        Defendant.                :  Pages 1 - 132

19   ------------------------------x

20              Deposition of James Shevlin

21                  Washington, D.C.

22              Wednesday, January 29, 2014
```



Page 17
1  accumulate all our concerns, and then send out
2  questions to the issuers before we would finalize
3  our bid for the tape.  Then once we were
4  successful bidder and we decided maybe what deals
5  might not be included, we then got a finalized
6  tape, and then we would assign those out
7  accordingly.
8      Q    So in that process, would it be common
9  to have the original loan documents from the
10 origination to look at?
11     A    In which process?
12     Q    In the process that you just described
13 to me of underwriting?
14     A    No.  The initial tape review, no, you
15 do not have loan documents.
16     Q    After the initial tape review, was
17 there another step in the underwriting process?
18     A    Right.  Once we were assigned and we
19 won -- we circled the deal, that's when we would
20 get the loan documents and the third-party
21 reports and all the accompanying information to
22 underwrite the transactions.

Page 18
1      Q    So -- because this is just a little
2  bit different from what we discussed this
3  morning, first you would just get a tape?
4      A    We would get a tape, a data tape, that
5  had a ton of information, a ton of fields of
6  location, tenants, whether it was recourse or
7  not, things like that.
8      Q    And at that point would you say well
9  some of these loans are out and we're only going
10 to continue the underwriting process with this
11 group of loans?
12     A    That's possible.
13     Q    Okay.
14     A    Right.
15     Q    And so then once you went on to the
16 next step, that included actually reviewing
17 specific loan documents -- well, we'll start
18 there.  Reviewing --
19     A    It was a more in-depth review you were
20 able to do at that point.
21     Q    It might have included, for example,
22 the actual notes?

Page 19
1      A    Possibly.  Not all the time we got
2  that because a lot of loans still weren't closed.
3  So we never really got the final loan docs a lot
4  of times.
5      Q    So it might be financial information
6  about the borrower?
7      A    Rent rolls, operating statements,
8  potentially personal financial statements, yeah,
9  and then every asset had like what they called an
10 ASR, asset summary report, that was provided for
11 each deal.
12     Q    Who provided the ASR?
13     A    The originators.
14     Q    I think you testified that in roughly
15 90, 95 percent of the pools that American
16 Capital's invested in, it's the controlling --
17 the controlling certificate holder?
18     A    That's correct.
19     Q    And as the controlling certificate
20 holder, does American Capital have certain rights
21 with regard to how that loan pool is managed?
22     A    Yes.

Page 20
1      Q    Based on what?  Where does it get
2  those rights?
3      A    From the PSA, the purchase and sale
4  agreement.
5      Q    As the controlling shareholder --
6  excuse me -- controlling certificate holder,
7  before the pool is created, does American Capital
8  have the ability to -- I think the terminology
9  that's used is kick out a loan from the pool?
10     A    Do we have the ability?  Can you
11 define like "ability"?
12     Q    Well --
13     A    We don't have the automatic kick-out
14 right.  We bid our deals -- you'll find what our
15 competition did.  They may have bid a bucket
16 where they may say Okay, we're going to agree to
17 kick out $20 million -- this is just an example
18 -- worth of loans.  We never bid that in our
19 letters.  Everything was kind of free game.  But
20 you know, do you have -- do you have an automatic
21 right to kick things out?  No.
22     Q    And I understand there's not like some



Page 21

1  contractual right to kick things out.
2     A    That's right.
3     Q    When you're determining -- American
4  Capital ultimately could determine not to invest
5  in a pool if there were loans in it that it did
6  not want to invest in, correct?
7     A    Correct.
8     Q    And so in discussions with originators
9  or whoever is putting -- whoever is attempting to
10 place the loans in the pool, American Capital can
11 negotiate with those entities about whether or
12 not it would like for a specific loan to be in a
13 pool; is that correct?
14    A    That's correct.
15    Q    And if American Capital says to one of
16 those originators this -- this is not a loan that
17 we want to be in the pool, is it still possible
18 for that loan to be in the pool?
19    A    Yes.
20    Q    And has that happened in your
21 experience?
22    A    Yes.

Page 22

1     Q    And what would cause that to happen?
2     A    When we first get the -- after our
3  initial review, we're assigning different ratings
4  to the deals: the red, yellow, green.  We may
5  identify 30 reds, and we're probably seeing what
6  sticks against -- what will stay.  But we know at
7  the end of the day, you have to have a pool.  You
8  just can't kick everything out.
9          What it does, it starts a discussion
10 of let's get some of these questions answered
11 that may be a reason why we marked it red.  It
12 could be because we don't have the legal docs.
13 It could be that we don't have a rent roll.  It
14 could be that we need some clarification about a
15 deal, and that's why it's marked that way.
16         There's a process that goes on.
17 There's questions that go back and forth to be
18 able to develop the final pool.  It may start as
19 a red and yellow, and it may all end up green.
20 And greens could end up being red, depends on
21 information that comes back to you.  It's a fluid
22 process.

Page 23

1     Q    What does the yellow indicate?
2     A    Red and yellow really -- there wasn't
3  much of a distinction between the two.  It needed
4  to be green to be in the pool that we would
5  accept.  A yellow meant that there was just very
6  minimal information that was needed to be able to
7  support our final conclusion.  It could be we
8  were just waiting on some document.
9     Q    And a red loan meant you didn't want
10 to include it in the pool?
11    A    We have some issues.
12    Q    At least while --
13    A    We're not saying that it would not be
14 included in the pool, just that there's major
15 concerns.  You need to get us comfortable with
16 the deal.
17    Q    While a loan is designated as red,
18 does that mean that as of that time you are
19 saying it's not going to be in the pool?
20    A    No.
21    Q    No?
22    A    No.  Until the final day, you know,

Page 24

1  because -- it's a process that goes back and
2  forth between the B-piece buyer and the
3  originator of trying to get that deal into a
4  pool.
5     Q    Do you know about how much American
6  Capital has invested -- in terms of dollar amount
7  has invested in CMBS loan pools?
8     A    You know, I don't have -- it's just a
9  guess.  You know, it's -- I think -- no.
10    Q    Over a billion dollars?
11    A    No.  I would say it's underneath that.
12 You have to define is it our investment or is it
13 the amount of the deal?
14    Q    What I'm asking really is how much of
15 American Capital's money was invested into the
16 pool?
17    A    It's less than a billion dollars.
18    Q    Less than a billion.  More than 500
19 million?
20    A    Yes.
21    Q    Okay.  Do you think it's more than 700
22 million?



Page 25

1  A   I would say it's around that.
2  Q   Okay. And about how many pools has it
3  invested in since it started in what you said
4  about -- well, you've been there since 2005,
5  correct?
6  A   '6.
7  Q   2006. From the time you've been
8  there, do you know how many pools it's invested
9  in?
10  A   It's approximately 30.
11  Q   And I take it that there's varying
12  sizes of pools?
13  A   That's correct.
14  Q   And varying --
15  A   And there's different positions in
16  each pools.
17  Q   And varying sizes of investments?
18  A   That's correct.
19  Q   What are some of the types of issues
20  that might make -- I know you went over this a
21  little bit. If you could give me some specific
22  examples of what might make a loan red.

Page 26

1  A   As I said earlier, it could be
2  anything from missing documentation, we don't
3  have the file. A tenant could be -- major tenant
4  could be rolling within the next year, and they
5  haven't structured properly for that. A tenant's
6  moved out during the site visit. A poor site
7  visit. Roof is collapsing. The collateral isn't
8  what they told us it was. They said it was a
9  retail center, and it's actually something
10  different. It's an office building. It's been a
11  variety of things.
12  Q   Okay. I assume it could include a
13  debt service coverage ratio that you weren't
14  comfortable with?
15  A   Yes.
16  Q   Low occupancy at the building?
17  A   Yes.
18  Q   The nature of the real estate market
19  in which the collateral is located?
20  A   Yes, but that's less likely than more
21  of a distinct item.
22  Q   Is -- is the existence of a guaranty

Page 27

1  important?
2  A   I mean it helps mitigate risk, yes,
3  from that standpoint.
4  Q   So I mean that's one of the
5  considerations that would be made as to whether a
6  loan is going to be placed in a pool or not?
7  A   You know, in CMBS, there's very few
8  recourse loans. Most of them all were limited --
9  non recourse, just for standard carve-out items.
10  So we didn't see too many recourse loans in the
11  deals.
12  Q   If it was a recourse loan, would that
13  make it more attractive?
14  A   In my opinion, no.
15  Q   Why not?
16  A   Well, there's no value to the
17  recourse. There's only value to the recourse
18  once a loan goes bad.
19  Q   So having a separate route to try to
20  enforce the loan if it does go bad doesn't
21  provide extra value to the loan?
22  A   No. It would not have provided any

Page 28

1  value day one.
2  Q   No? When you say day one, what do you
3  mean?
4  A   Day one, the day we bought the pool.
5  Q   Does it provide value at some point
6  after that?
7  A   It only provides value when it goes
8  into special servicing and it goes bad.
9  Q   Referring to the trust, I think you
10  mentioned earlier that CW Capital does most of
11  the special servicing for American Capital,
12  right?
13  A   That's correct.
14  Q   And it's a special servicer for this
15  particular trust?
16  A   Yes. Currently, yes.
17  Q   And you personally have worked with
18  American -- with CW Capital quite a bit?
19  A   Absolutely, yes.
20  Q   Any particular names that you can
21  recall of people you worked with at CW Capital?
22  A   I mean I can go down the whole roster.



Page 37
1  Q    And ultimately -- CW Capital is for
2  all practical purposes the trust; is that
3  correct?
4       MR. CROSS:  Objection.
5       THE WITNESS:  No.
6  BY MR. DOOLEY:
7  Q    It's a weird question.  CW Capital as
8  the special servicer is representing the trust;
9  is that correct?
10 A    Yes.
11 Q    And so when you deal with CW Capital
12 regarding a specific loan, as a practical matter,
13 are you dealing with the representative of the
14 trust?
15 A    Yes.
16 Q    I'm not trying to trick you.
17 A    Yeah.
18 Q    Are you familiar with a loan that's in
19 the trust that was made by what was then called
20 Artesia, it's now called Dexia, to MP Operating,
21 LLC, and Annex Operating, LLC?
22 A    Yes.

Page 38
1  Q    Is that commonly referred to as the
2  Marketplace loan?
3  A    We refer to it as Marketplace Retail.
4  Q    Marketplace Retail.  If I refer to it
5  as the Marketplace loan or Marketplace Retail, we
6  understand that that's the loan we're talking
7  about?
8  A    Yes.
9  Q    Do you remember at what point you
10 became aware of the Marketplace Retail loan?
11 Very first time you became aware of it?
12 A    At -- after purchasing the bonds, I
13 was probably aware of it because I probably
14 assigned the rating to it and had conversations
15 back and forth with Artesia on it.
16 Q    So you would have had direct
17 conversations with Artesia?
18 A    That's correct.
19 Q    And you would have reviewed whatever
20 information American Capital had determined it
21 needed regarding the loan?
22 A    To the best of my ability, yeah.

Page 39
1  Q    Okay.  I'm just -- I'm making sure you
2  personally would have reviewed that information.
3  A    On that specific deal, probably.
4  Q    Okay.  And do you recall what the
5  strengths of that loan were?
6  A    Yes.
7  Q    Okay.  What's your recollection of
8  what those strengths were?
9  A    That it was fairly newly purchased.
10 There was a-million-8 of hard equity in the deal
11 and that Artesia had structured around some of
12 the credit concerns.
13 Q    How had they structured around some of
14 the credit concerns?
15 A    They had a master lease from the
16 borrower for I think it was three years.  They
17 had holdbacks for earnouts.  They had a full
18 recourse.
19 Q    A full recourse guaranty?
20 A    That's correct.
21 Q    What were the weaknesses of the loan,
22 the Marketplace loan?

Page 40
1  A    The weaknesses, why we made it red
2  was -- I think historically the operations were
3  choppy in terms of cash flow.  It was anchored by
4  a K-Mart, which at the time K-Mart wasn't the
5  best credit.  And it was a mixed use.  I remember
6  it being mixed use.  It's not just strict office.
7  It's office, retail, and some other components to
8  it.
9  Q    I'm actually just curious.  Mixed use
10 is typically considered not as good collateral?
11 A    Yes, because it's harder to manage and
12 harder to lease because you have different
13 functions within the deal.
14 Q    Do you recall American Capital asking
15 specifically for more information about the loan
16 from the originator?
17 A    Yes.
18 Q    And what kind of information did
19 American Capital ask for?
20 A    You know, I don't remember.
21 Q    You just remember that questions were
22 asked?



Page 41
1   A   Yes, because I remember it was rated
2  red to start.  So then obviously there was going
3  to be conversations going back and forth.
4    Q   Were those issues that you just
5  mentioned that were weaknesses, those were the
6  reasons it was rated as red?
7    A   I believe so.
8    Q   And just to be clear, red meant that
9  as of that time at least --
10   A   We were having major problems with the
11  deal.
12   Q   Okay.  Is there a term that's common
13  with regard to the formation of these -- kick-out
14  of the loan?  I'll be honest.  I see it all over
15  several documents where people refer to kicking
16  out a loan.  I'm just curious if that's something
17  you're familiar with.
18   A   A kick-out is somewhat of a standard
19  term.  It's a weird term.  It's more of a removal
20  of a loan from a pool.
21   Q   Does red mean that it's at least at
22  that time being slated for kick-out?

Page 42
1   A   No, no.  The kick-outs, like I said
2  earlier, are not determined really until we
3  finalize the pool.  The initial ratings that
4  things receive really are to more generate the
5  conversation back and forth.
6    Q   So let's look at Exhibit 1.  Your
7  attorney has put in front of you what we
8  previously marked as Exhibit 1, and it will be
9  Exhibit 1 for your deposition as well.
10       MR. CROSS:  It's Cooper Exhibit 1 so
11  the record is clear.
12  BY MR. DOOLEY:
13   Q   Have you read it?
14   A   Yeah.
15   Q   Do you know who Melissa Duncan is?
16   A   I do not.
17   Q   Okay.  Just for the record, this is an
18  e-mail from Melissa Duncan to Doug Sindak.  Do
19  you know who Doug Sindak is?
20   A   The name sounds familiar, but I'm not
21  sure who that is.
22   Q   Okay.  And it's dated September 22nd,

Page 43
1  2006; is that right?
2    A   Yes.
3    Q   And reading through the first couple
4  lines, it says, "The following questions have
5  been submitted by the B-buyer regarding the
6  above-referenced loan."  Is B-buyer, do you
7  understand that to refer to American Capital?
8    A   Yes.
9    Q   Because subject is "Marketplace Retail
10  and Office Center," right?
11   A   Yes.
12   Q   And then in smaller font, it says,
13  "Need details of the full recourse guaranty and
14  how it burns off.  Previous owner never achieved
15  an occupancy over 75 percent.  Need info on the
16  full recourse burn-off.  Tired retailed.
17  Unappealing office space."  First of all, do you
18  recall that being an issue that the previous
19  owner had never achieved over 75 percent
20  occupancy?
21   A   Yes.  As I stated earlier, I think it
22  was choppy cash flow operations historically.

Page 44
1    Q   So choppy cash flow is to you kind of
2  synonymous?
3    A   Right, because occupancy obviously
4  ties into cash flows.
5    Q   Do you recall this specific question
6  regarding the recourse guaranty being asked?
7    A   As of today, no, I don't remember.
8    Q   Just no specific recollection of that?
9    A   It's seven years ago.  No.
10   Q   Do you know what it means when it asks
11  "need details of the full recourse guaranty and
12  how it burns off"?
13   A   Yes.
14   Q   What does -- what does the burn-off
15  part refer to?
16   A   Burn-off refers to how -- there are
17  certain triggers for the recourse to be released.
18  And we were probably asking questions on, you
19  know, what specifics does the borrower need to
20  achieve to be able to have it go away.
21   Q   When you say it go away --
22   A   The recourse.



Page 77

1  a full recourse guaranty in a loan?
2     A    When the loan goes into default,
3  absolutely.
4     Q    So you never know when a loan
5  originated whether it's going to go into default,
6  do you?
7     A    You want them all to perform.
8     Q    When a loan is securitized, you don't
9  know whether it's going to go into default,
10  correct?
11     A    You think they're all going to
12  perform.
13     Q    Would you view having a full recourse
14  guaranty almost like having an insurance policy,
15  that it's another way to collect the money if
16  needed?
17     A    In my opinion, no, because at that
18  point when the deal goes into default, you have
19  no idea what the value of that recourse is.
20  Borrowers typically send money -- get divorced,
21  things happen where their net worth and liquidity
22  goes away.  You have no idea.  You know what

Page 78

1  their net worth and liquidity is the day it's
2  originated.  You have no idea when that recourse
3  event occurs three or four years down the road
4  what you're going to get out of it.
5     Q    So you're saying you really don't
6  assign any value to a full recourse guaranty?
7     A    That's right.
8     Q    And yet there's much talk about it --
9     A    That's right.
10     Q    -- in these e-mails and reports,
11  correct?
12     A    I think you summarized it well when
13  you said use it as a threat.  Absolutely.  Make
14  your payments.
15        MR. CROSS:  You want 9?
16        MR. DOOLEY:  Yes.
17  BY MR. DOOLEY:
18     Q    So this is an e-mail -- the top one is
19  an e-mail from Evan Kurtz to Doug Cooper and
20  yourself on February 2010, right?
21     A    Right.
22     Q    And Mr. Kurtz says to you and Mr.

Page 79

1  Cooper, "At least the loan is full recourse."  Do
2  you know why he would have said that?
3     A    I think probably because now the loan
4  is likely going to be transferred into special
5  servicing because they were in monetary default
6  at that point.  And that may be, you know, a way
7  to get the borrower to come current.
8     Q    Would you say that he's expressing
9  that there's some benefit to having the loan be
10  full recourse?
11     A    It potentially could be a benefit at
12  this point.
13     Q    And he's responding to Mr. Cooper
14  saying, "That's a sorry looking center," right?
15     A    Yes.
16     Q    And he says, "Minnesota too," which he
17  and I discussed that.  I'm sure you don't know
18  exactly what that means.
19     A    Well, actually Evan's from Minnesota.
20  So there might have been some bantering back and
21  forth.
22     Q    Do you know whether it's particularly

Page 80

1  difficult to foreclose on collateral in Minnesota
2  as compared to other states?
3     A    You know, I don't have specific
4  knowledge, but certain states make it more
5  difficult to get to the collateral.  I'm not sure
6  if there's a redemption period in that state or
7  not.
8     Q    So do you feel like American Capital
9  saw some benefit to having a full recourse
10  guaranty at least with regard to this loan?
11        MR. CROSS:  Objection.  At what point
12  in time?
13        THE WITNESS:  Yeah.  At what point in
14  time?  As I stated earlier, day one it had no
15  value.  When it went into monetary default, we
16  can use it as a tool to try to get the
17  borrower -- we're going to come after you if you
18  don't bring this current.  There were four
19  guarantors here.  Hopefully somebody stepped up
20  to the plate.  And if not, we're going to come
21  after you.  We typically don't have that hook on
22  any other deal because it's not recourse.



Page 81

1  BY MR. DOOLEY:
2   Q   Would this loan have been securitized
3  in this pool if that full guaranty wasn't
4  present?
5   A   As I stated earlier, I don't think --
6  it helped mitigate the risk, but I believe it
7  would have been securitized anyway.  I think what
8  was the real trigger to get this thing
9  securitized was when they added the additional
10 300,000 of earnout reserve after that tenant
11 moved out.  You're guaranteed rent for a period
12 of time.  Cash in hand is better to us than
13 having to go fight for a guaranty.
14  Q   Do you -- are you familiar with the --
15 so getting back to the Stearns County -- the
16 Minnesota litigation that I referred to earlier,
17 and I don't remember where we left off on it.  So
18 just to backtrack, do you have an understanding
19 of why that litigation was brought?
20  A   No.
21  Q   Do you know who filed the lawsuit?
22  A   No.

Page 82

1   Q   So I'll represent to you that the
2  trust filed the lawsuit as a result of the
3  default of the borrowers.
4   A   Okay.  That rings a bell.  I know the
5  borrower was thinking of suing for the reserves
6  too.  So I'm not sure which one you were
7  referring to.  That's why.
8   Q   Okay.  Do you now recall that the
9  trust did sue to enforce the rights and remedies
10 under the loan document?
11  A   Yes.
12  Q   Do you know what the outcome of that
13 lawsuit was?
14  A   Yes.
15  Q   What was it?
16  A   That the court determined that
17 recourse was not in existence.
18  Q   And is it your understanding that the
19 borrowers argued that they did not sign a full
20 recourse guaranty?
21  A   I believe that's what -- yes, that's
22 what they were claiming.

Page 83

1   Q   Do you know when the borrowers made
2  the trust aware that that was their position?
3   A   No.
4   Q   Go ahead and look at 10.
5   A   Okay.  So this looks like a document
6  between CW Capital and counsel.
7   Q   So Joe Diggs I will tell you is a --
8  not an attorney but a representative that the
9  borrowers and guarantors hired to try to
10 negotiate a resolution.
11  A   A workout consultant?
12  Q   Yes.  And if you'll look at the third
13 paragraph down, it says, "Further, you have
14 mentioned in previous correspondence that the
15 loan is full recourse to the guarantors."  Do you
16 recall Mr. Shearer making those representations?
17  A   To them, no.
18  Q   So you didn't have any knowledge
19 specific to Mr. Shearer telling them Hey, this is
20 a full recourse loan?
21  A   There could have been correspondence,
22 I guess, between us.  But no, I don't remember

Page 84

1  that specifically.
2   Q   So you don't remember American Capital
3  having any input into correspondence between CW
4  Capital and the borrowers?
5   A   We never would have sent e-mails to
6  the borrowers.
7   Q   I know American Capital wouldn't.
8  What I'm asking is, at this point when this
9  dispute was beginning, did American Capital give
10 any direction to CW Capital regarding
11 correspondence with the borrowers?
12  A   No.
13  Q   Okay.  So he goes on to say, "Upon
14 review of the executed loan document (limited
15 recourse obligations guaranty) the recourse is
16 limited in a manner whereas the guarantors,
17 jointly and severally, are only" liable -- "are
18 only personally liable for all losses, costs,
19 damages, and expenses incurred by lender in the
20 following instances."  And then I'm not going to
21 read it out loud.  I'm let you read.
22  A   The bad boy carve-outs.



JAMES SHEVLIN                                                                    January 29, 2014
U.S. BANK NATIONAL -vs- DEXIA                                                          85–88

| | Page 85 | | Page 87 |
|---|---|---|---|
| 1 | Q    You understand those are basically bad | 1 | is -- this is fact, and you know, personally this |
| 2 | boy carve-outs? | 2 | has no weight for us.  We get letters all the |
| 3 | A    Right. | 3 | time from workout consultants alleging so many |
| 4 | Q    And so would you take this to mean | 4 | different things that we have loan docs.  His |
| 5 | that the borrowers at this point on May 26, 2010 | 5 | interpretation is worthless to us. |
| 6 | are informing the trust that they do not believe | 6 | Q    That still doesn't answer my question |
| 7 | the loan -- that they do not believe it's a full | 7 | though.  Do you not understand what he's saying? |
| 8 | recourse guaranty? | 8 | MR. CROSS:  I think it does.  Let's |
| 9 | A    You know, borrowers try everything to | 9 | not argue with him. |
| 10 | throw against the wall to see what sticks too. | 10 | MR. DOOLEY:  It doesn't. |
| 11 | And obviously this guy's not an attorney.  I | 11 | MR. CROSS:  You've asked it now five |
| 12 | would never -- I would give it zero worth. | 12 | times. |
| 13 | Q    So you don't give it any worth? | 13 | MR. DOOLEY:  Because he hasn't |
| 14 | A    No. | 14 | answered it. |
| 15 | Q    I think we can agree that they've at | 15 | MR. CROSS:  He never saw the document. |
| 16 | least made their argument at this point, correct? | 16 | The document speaks for itself, and you're asking |
| 17 | MR. CROSS:  Objection. | 17 | him to now -- he's told you five times -- we can |
| 18 | THE WITNESS:  The borrower didn't. | 18 | read them all back.  This is a workout |
| 19 | This consultant did. | 19 | consultant's assertion.  That's what he said.  He |
| 20 | BY MR. DOOLEY: | 20 | doesn't know if it's the guarantor's assertion. |
| 21 | Q    Mr. Diggs? | 21 | He said it's a workout consultant's assertion. |
| 22 | A    Right, who is probably compensated | 22 | They see it all the time. |

| | Page 86 | | Page 88 |
|---|---|---|---|
| 1 | only if he gets a deal done. | 1 | MR. DOOLEY:  That doesn't answer what |
| 2 | Q    And I understand all that.  By this | 2 | his understanding of the position is. |
| 3 | language, do you understand the guarantors to at | 3 | THE WITNESS:  I'm saying he's picking |
| 4 | least be alleging that the loan is not full | 4 | and choosing certain points within the loan docs |
| 5 | recourse? | 5 | to state this one fact.  Yes, they have bad boy |
| 6 | A    No, no.  They -- no.  Because I think | 6 | carve-outs too.  They have to make sure that they |
| 7 | he's picking and choosing different parts of the | 7 | don't commit -- steal funds and cause |
| 8 | loan to emphasize.  They also had probably a bad | 8 | environmental harm and misappropriate different |
| 9 | boy carve-out requirement.  He just neglected to | 9 | things and cause harm.  That is true.  That's |
| 10 | include his recourse provisions in this note. | 10 | absolutely true. |
| 11 | Q    Regardless of whether he's right or | 11 | But he also neglected to include his |
| 12 | wrong -- | 12 | recourse requirement in the deal.  He also |
| 13 | A    Yeah. | 13 | doesn't mention his -- his points -- where are |
| 14 | Q    -- what is your understanding of what | 14 | the points about the reserves that the borrower's |
| 15 | he's saying? | 15 | fighting to get back every dime.  He just picks |
| 16 | A    I think -- | 16 | and chooses what he wants to write. |
| 17 | Q    If I said that wall is red, do you | 17 | BY MR. DOOLEY: |
| 18 | understand me to be saying that wall is red? | 18 | Q    Okay.  But I'm asking you if you have |
| 19 | A    Yes. | 19 | an understanding of what point he's trying to |
| 20 | Q    Even though it's not red? | 20 | convey. |
| 21 | A    Right.  He's picking and choosing | 21 | MR. CROSS:  Objection.  He's answered |
| 22 | points he wants within the deal to -- to say this | 22 | it now six times. |



800.211.DEPO (3376)
EsquireSolutions.com

JAMES SHEVLIN  
U.S. BANK NATIONAL -vs- DEXIA

January 29, 2014  
109–112

Page 109

1  Q  It's executed, correct?
2  A  Yes.
3  Q  So I know we had a little disagreement
4  over whether we could interpret that -- an e-mail
5  in the past.  Is there any doubt in your mind
6  that the guarantors are telling the trust in this
7  e-mail we feel that the loan is not full
8  recourse?
9  A  I don't really care what the borrower
10  is saying.  The borrower is in default.  They
11  signed a recourse document.  I have no idea.  The
12  borrower could have fabricated and cut and pasted
13  this themselves.
14  Q  Absolutely.
15  A  I have no idea.
16  Q  Is it your understanding that they are
17  taking the position that they did not sign a full
18  recourse guaranty?
19     MR. CROSS:  Based upon?
20  BY MR. DOOLEY:
21  Q  Based upon this e-mail with the
22  attached guaranty.  When I say they, I mean the

Page 110

1  borrowers and --
2  A  I'm going to have to go back to what I
3  said before.  They're going to throw everything
4  against the wall to see what sticks and not.  You
5  know, they're going to assert a bunch of
6  different things.  They're in default.  They
7  don't want us to come after them personally, and
8  they're going to try and fight tooth and nail,
9  and we're going to fight tooth and nail to prove
10  that recourse is in place.
11  Q  Absolutely.  I would do the same.
12  A  Yes.
13  Q  My question is, are they taking a
14  position in this e-mail with regard to whether
15  they signed a full recourse guaranty?  I'm not
16  asking whether they're right.  I'm not asking
17  whether they have a legal claim.  I'm not asking
18  you to give me anything other than is that the
19  position they're taking?  I'm not trying to trick
20  you.
21  A  I guess.  I don't know.
22  Q  And my question is, if they took that

Page 111

1  position here in August 26, 2010, and provided
2  this document, this guaranty, why didn't a
3  repurchase demand go out at this time?
4  A  Because -- just because the borrower
5  is stating it does not mean it's a fact.  The
6  fact did not occur until the judge ruled that
7  there was no recourse in place.  This is not a
8  fact.  If the borrower also said I'm going to,
9  you know, send you payments and do that, are we
10  going to believe that too until he does it?  Just
11  because they state it doesn't mean it's a fact.
12  Q  Okay.  At this point would it have
13  been prudent to contact Dexia to see if they had
14  any insight into --
15  A  In my opinion, no.
16  Q  Why?
17  A  Because it's not the fact.  We have
18  the loan documents.  We knew it was a full
19  recourse loan.  Wells -- Wachovia verified that
20  they had not, you know, taken that full recourse
21  away.  Just because the borrower is stating it
22  because he probably got pressure from us, from

Page 112

1  the trust, that we're going after you personally,
2  and now he's trying to, you know, state a
3  different fact.
4  Q  So then --
5  A  That's why we're going to court.
6  Q  Is it your opinion then that they're
7  actually -- that the loan is full recourse?
8  A  Absolutely.
9  Q  So the loan is full recourse?
10  A  On this date, absolutely.  Until the
11  judge ruled it was not a recourse loan, it was
12  full recourse in our opinion.  Just because the
13  borrower stated it doesn't mean it's factual.
14  Q  So what is your understanding of what
15  the judge's ruling is based on?
16  A  You know, I don't have that -- I just
17  know the outcome was that the judge ruled that
18  there was not a recourse in place.  The borrower
19  has nothing to lose by putting this e-mail out
20  there.
21  Q  And I'm sorry.  Remind me again why
22  you said it wouldn't be useful to contact Dexia

